**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                              No. 20-CR-2124 MV

OLUTAYO OGUNLAJA, ET AL

        Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

THIS MATTER is before the Court on the government's Motion in Limine to Admit 404(b) Evidence [Doc. 102] and the government's Second Motion in Limine to Admit 404(b) Evidence [Doc. 120]. Having considered the briefs and relevant law, and being otherwise fully informed, the Court finds that the motions are well-taken and will be granted.

**BACKGROUND**

On December 2, 2020, Joseph Oloaosebikan Olawuyi (a.k.a. Ibrahim Musa/Glenn Brown), Olutayo Sunday Ogunlaja, Gbemileke Bello, Adesuwa Renee Ogiozee, and Abel Adeyi Daramola, were indicted in the District of New Mexico. The Indictment alleges that from approximately January 2016 through November 2016, Defendants knowingly, unlawfully, and willfully conspired to commit wire fraud, in violation of 18 U.S.C. § 1343, and aiding and abetting, in violation of 18 U.S.C. § 2. According to the Indictment, in January of 2016, Mr. Joseph Olawuyi used the online persona "Glenn Brown" to register on eHarmony.com. Doc. 1 at 3. Acting as "Glenn Brown," he began a romantic relationship with the victim, B.D., who was a resident of New Mexico. *Id.* He told B.D. that he was working to repair roads in Malaysia. *Id.* For instance, in one email sent on January 13, 2016, Mr. Olawuyi said "Just in case you should know that I'm currently in Southeast Asian [sic], Malaysia I've been working out here off and on for 1 year. I am

working on a road construction project." Doc. 102 at 2. Gradually, Mr. Olawuyi began to inform B.D. that his business was presenting financial challenges. *Id.* In one email he stated, "I had such a lousy dat [sic] discussing issues with my staffs [sic] about the finishing of the project and what may be needed or what is not required for the finish up" and after explaining that he had issues with investors he added "my savings wasn't enough to pull off the project." *Id.* Eventually, he started expressly asking for money. *Id.* After describing financial issues with the road project, he stated "I have seen the worse, starvation should not rip my life off. I just needed the balance of $36,500 . . . Today, you can try to wire $15,000. Next week on Tuesday you can then wire the remaining $20,000. Or you could even make it another $10,000 then Wednesday you can wire the remaining $10,000." *Id.* at 3. He explained that "if you should do it this way, you will be less worried and the bank won't question you so much . . . if you tend to wanna wire the whole $36,500, the bank will be too concern. Let not raise so much alarm." *Id.* Mr. Olawuyi promised B.D. that he would pay her back once he was able to get back to the United States. *Id.*

Utilizing his story that he was stuck in Malaysia and needed money to get out, Mr. Olawuyi repeatedly provided B.D. with information for various bank accounts and requested that she transfer money to those accounts. *Id.* He also asked B.D. to send him gift cards. *Id.* The requests and transfers occurred as follows:

- January 25, 2016: Olawuyi requested that B.D. transfer $20,000 to a Maybank account in the name of Raidah Binti Tali and requested another $20,000 be transferred to a Maybank account in the name of Roziah Binti Pedlah. B.D. completed both requests and transferred a total of $40,000.

- February 1, 2016: Olawuyi requested that B.D. transfer $70,000 to a CIMB Bank account in the name of Lindone Enterprise. B.D. completed the request.

- February 8, 2016: Olawuyi requested that B.D. transfer $20,000 to a CIMB Bank account in the name of DJ Resources. B.D. completed the request.

- February 16, 2016: Olawuyi requested that B.D. transfer $20,000 to a CIMB Bank account in the name of Che Hasnah Binti Harun. B.D. completed the request.

- March 1, 2016: Olawuyi requested that B.D. transfer $10,500 to a Bank Islam Malaysia account in the name of Che Hasnah Binti Harun. B.D. completed the request.

- March 2, 2016: Olawuyi requested that B.D. upload $500 on an iTunes gift card for Glenn Brown.

- March 3, 2016: Olawuyi requested that B.D. upload $500 on an iTunes gift card for Glenn Brown.

- March 4, 2016: Olawuyi requested that B.D. transfer $15,500 to a TD bank account in the name of Christopher James Root. B.D. completed the request.

- March 8, 2016: Olawuyi requested that B.D. upload $500 on an iTunes gift card for Glenn Brown.

- March 9, 2016: Olawuyi requested that B.D. upload $500 on an iTunes gift card for Glenn Brown. Olawuyi sent B.D. the details of a bank account in the name of Olutayo Ogunlaja and said, "Honey don't forget that it has to be a cash deposit." Doc. 102 at 3. B.D. transferred $20,000 to an account in the name of Olutayo Ogunlaja.

- March 15, 2016: Olawuyi requested that B.D. deposit $20,000 into a Bank of America Account in the name of Olutayo Ogunlaja. B.D. completed the request. In March of 2016, Mr. Ogunlaja made multiple cash withdrawals and transfers to other Bank of America accounts, totaling $38,100.

- March 17, 2016: Olawuyi requested that B.D. upload $500 on an iTunes gift card for Glenn Brown.

- March 18, 2016: Olawuyi requested that B.D. transfer $20,000 to a TD Bank account in the name of Christopher James Root. B.D. completed the request.

- March 22, 2016: Olawuyi requested that B.D. transfer $15,000 to a TD Bank account in the name of Christopher James Root. B.D. completed the request.

- March 24, 2016: Olawuyi requested that B.D. transfer $10,500 to a TD Bank account in the name of Christopher James Root. B.D. completed the request.

- March 31, 2016: Olawuyi requested that B.D. upload $300 on a Visa gift card for Glenn Brown.

- April 15, 2016: Olawuyi requested that B.D. transfer $20,000 to a TD Bank account in the name of Christopher James Root. B.D. completed the request.

- April 19, 2016: Olawuyi requested that B.D. transfer $20,000 to a TD Bank account in the name of Christopher James Root. B.D. completed the request.

- May 6, 2016: Olawuyi requested that B.D. upload $200 on a Visa gift card for Glenn Brown.

- May 20, 2016: Olawuyi requested that B.D. transfer $5,000 to a TD Bank account in the name of Christopher James Root. B.D. completed the request.

- July 21, 2016: Olawuyi requested that B.D. transfer $20,000 to a TD Bank account in the name of Christopher James Root. He made a separate request for $30,000 to be transferred to the same bank account. B.D. completed both requests.

- July 26, 2016: Olawuyi requested that B.D. transfer $60,000 to a TD Bank account in the name of Alma Callaway. B.D. completed the request.

- July 28, 2016: Olawuyi requested that B.D. transfer $30,000 to a TD Bank account in the name of Christopher James Root. B.D. completed the request.

- August 8, 2016: He requested that B.D. transfer $40,000 to a TD Bank account in the name of Christopher James Root. B.D. completed the request.

- August 12, 2016: He requested that B.D. transfer $40,000 to a TD Bank account in the name of Christopher James Root. B.D. completed the request.

- September 27, 2016: He requested that B.D. transfer $28,000 to a Woodforest Bank account in the name of Daramola Cars. B.D. completed the request.

- October 19, 2016: He requested that B.D. transfer $3,000 to a TD Bank account in the name of Christopher James Root. B.D. completed the request.

- November 30, 2016: He requested that B.D. transfer $2,000 to a TD Bank account in the name of Christopher James Root. B.D. completed the request.

Doc. 1 at 3–9. In total, in response to Mr. Olawuyi's requests, B.D. transferred approximately $558,500 to various bank accounts. *Id.* Of particular relevance here, in response to Mr. Olawuyi's requests, B.D. wired to Mr. Ogunlaga a total of $40,000. Doc. 102 at 4.

On October 27, 2023 and March 7, 2024, the government filed its instant motions in limine seeking to admit evidence relating to Mr. Ogunlaja under Rule 404(b). Mr. Ogunlaja filed responses in opposition on November 27, 2023 and March 28, 2024. The Court held a hearing on

the motions on May 28, 2024, in which it heard expert testimony from computer scientist Matthew Nguyen and FBI Special Agent Joel vanBrandwijk. That testimony was as follows.

Agent vanBrandwijk testified that on September 9, 2021, he and other FBI agents went to Mr. Ogunlaja's home in Atlanta, Georgia to effectuate an arrest warrant. Doc. 165 at 56:11–19. Upon arrival, Agent vanBrandwijk spoke with Mr. Ogunlaja. *Id.* at 57:13–23. Because Mr. Ogunlaja was not fully clothed when he first answered the door, Agent vanBrandwijk asked him if agents could go into his apartment and retrieve clothing for him, and Mr. Ogunlaja consented to having the agents enter his apartment. *Id.* at 57:16–18. After the agents retrieved clothes for Mr. Ogunlaja, they informed Agent vanBrandwijk that there were two cellphones and a laptop in the apartment. *Id.* One cellphone was an iPhone 11 model A2111 ("the iPhone 11") and an iPhone SE model 1662 ("the iPhone SE"). Doc. 120 at 2. Agent vanBrandwijk asked Mr. Ogunlaja if he wanted to speak with him at the Atlanta FBI office and if he could take the phones and laptop to have available during their conversation. Doc. 165 at 57:24–58:4. Mr. Ogunlaja consented to speak with Agent vanBrandwijk and consented to having the phones removed from his apartment. *Id.* at 58:4.

Once at the Atlanta office, Agent vanBrandwijk began interviewing Mr. Ogunlaja and asked for the PIN code for the iPhone 11, which Mr. Ogunlaja provided. *Id.* at 58:22:25. The PIN code unlocked the iPhone 11. *Id.* at 58:24–25. Agent vanBrandwijk then asked to review the iPhone SE, at which point Mr. Ogunlaja claimed that the phone did not belong to him and instead belonged to a friend who was staying with him. *Id.* at 59:14–17. Nevertheless, Mr. Ogunlaja signed a consent form for both the iPhone 11 and iPhone SE. Government's Exhibit 14. Agent vanBrandwijk entered the same PIN code used to unlock the iPhone 11 and successfully unlocked the iPhone SE. Doc. 165 at 61:1–9. Mr. Ogunlaja did not provide an explanation as to why the

same code unlocked both phones. *Id.* at 61:17.

Matthew Nguyen, a computer scientist with the FBI, conducted forensic analysis on the iPhone 11 and iPhone SE and concluded that "they were very likely to be used by the same individual." Doc. 165 at 11:8–9. Using Cellebrite technology, Mr. Nguyen was able to determine that the iPhone 11 had a user-defined name of "Olutayo's iPhone." *Id.* at 12:1–6. He also determined that the phone number associated with the iPhone 11 was 470-769-0637. *Id.* at 13:23. When he examined the contents of the phone, his discovered a COVID lab test, a visa rejection form, a social security card, and a roofing quote, all bearing Mr. Ogunlaja's name. *Id.* at 14:4–7. The COVID lab test and the visa form listed Mr. Ogunlaja's email as dankupapas@gmail.com, which was also the email associated with Instagram and Snapchat accounts on the phone. *Id.* at 16:1–10. Mr. Nguyen also analyzed the iPhone SE and found that the iPhone SE and iPhone 11 had overlapping MSISDNs and ICCIDs, which indicated to him that "the user had inserted the same SIM card with same mobile number on both devices." *Id.* at 17:12–20. Both the iPhone SE and the iPhone 11 had been used to access six of the same email accounts, although the dankupapas@gmail.com account that belonged to Mr. Ogunlaja was not one of the overlapping accounts. *Id.* at 18:2–3. Furthermore, the iPhone 11 had a Tinder application installed and was used to access it, but the contact number for the Tinder account was the phone number of the iPhone SE. *Id.* 18:22–24. Based on this fact, Mr. Nguyen concluded that "two-factor authentication was being used on the iPhone SE to access the Tinder account installed on the iPhone 11 and that the users are most likely the same." *Id.* at 19:1–4. Lastly, both devices had connected to several identical Wi-Fi access points as well as the same Bluetooth devices. *Id.* at 19:10–12. One of the Wi-Fi access points was named "Olutayo85." *Id.* at 19:23–25.

The government intends to present 10 exhibits, extracted from the iPhone 11 and iPhone SE, as relevant other acts evidence under Rule 404(b).[1] The exhibits are described below.

**Exhibit 1: Ogunlaja's Perpetration of a Romance Scam Upon M.J.S.**

The government intends to present evidence that, between December 2018 and November 2020, Mr. Ogunlaja attempted to perpetrate a romance scam on M.J.S. Doc. 102 at 7. Specifically, the government alleges that Mr. Ogunlaja posed as someone named "Tracy Williams," began a romantic relationship with M.J.S., and then asked her to send him money under false pretenses. *Id.* Exhibit 1 ("Exh. 1") consists of text conversations, extracted from the iPhone 11, between "Tracy Williams" and M.J.S.

The text messages show numerous conversations in which "Tracy" appears to claim that he is stuck in Malaysia and needs help getting home. Pages 1 through 15 consist of text conversations between "Tracy Williams" and M.J.S., where they tell each other they love each other and M.J.S. frequently says she worries about him. "Tracy" repeatedly asked M.J.S for money. For instance, on December 19, 2018, he sent a message saying, "Still need 4K more," and M.J.S. responded, "I don't know what to do I have no money I was hoping you would get home its taking every thing I have t[o] live." To which "Tracy" added, "I just need 4K more," and "I have no where [sic] to run to." Doc. 103–1 at 17–18. On December 29, 2019, "Tracy" sent a message stating that he had been detained in immigration custody and added, "I need money for food and toiletries in here," and, "is there anyway you can help." *Id.* at 22–23. This pattern of conversation goes on for a total of 159 pages. "Tracy" repeatedly asked for money transfers and for M.J.S. to put money on a gift card to "load his phone" so that he can call her. *See* Exh. 1 at 27,

---

[1] Exhibits 1 to 5 were provided to the Court as Docs. 103–1 to 103–5, and Exhibits 6 to 10 were provided to the Court as Docs. 121–1 to 121–5.

28, 37, 53, 54–56, 59, 60, 61, 63, 64, 68, 69, 73, 78, 88, 89, 98, 99, 106, 108, 109, 113, 114, 116–121, 145, 148, 150, 152. At various points, he suggested that she sell her house to obtain money and asked for her full name, address, and tax return. *Id.* at 33, 62. He also instructed M.J.S. to get a $2,000 loan from a bank or Title Max, supposedly in order to get him a plane ticket back to the United States. *Id.* at 79. "Tracy" also sent messages indicating emotional distress. For instance, on January 24, 2019, he said:

> "I'm going crazy here. I need money to leave here. Been crying all night. I'm so tired now I feel like dying. I feel like this world is not meant for me with all the things I'm going through. I'm so heartbroken, no one can help me, no one to call my friend, no family, nobody. I feel like committing suicide."

*Id.* at 83. When M.J.S. would send money, he would instruct her how to use the Wells Fargo ATM to deposit cash into an account. *Id.* at 65–68, 97–105, 123–127.

**Exhibit 2: Ogunlaja's Attempted Perpetration of a Romance Scam Upon Phone Number Ending in 8007**

Exhibit 2 ("Exh. 2") is an extraction from the iPhone 11 which shows Mr. Ogunlaja, again posing as "Tracy Williams," communicating with someone with a phone number ending in 8007 ("Jane Doe") between December 2018 and January 2019. In the messages, Mr. Ogunlaja told Jane Doe that he was working in Malaysia. Exh. 2 at 3 ("I appreciate that you send me some Malaysia photos"); *Id.* at 6 ("When are you complete the work?"). On January 2, 2019, he told Jane Doe that "the work has been completed. I was paid with a certified check and couldn't cash my check in Malaysia until I get to U.S. but I don't have enough to ship my equipments back to the states." *Id.* at 7. Jane Doe responded, "it sounds like internet scam." *Id.*

**Exhibit 3: Ogunlaja's Attempted Perpetration of a Romance Scam Upon "Billie"**

Exhibit 3 is an extraction from the iPhone 11 that shows conversations between Mr. Ogunlaja, posing as someone named "David," and someone named Billie that occurred between

December 2018 and March 2019. On December 20, 2018, Mr. Ogunlaja told Billie that "my son sent me 23k and still need about $8500 more." Exh. 3 at 1. Billie replied, "Keep trying. I cannot help you." *Id.* After exchanging several texts, Mr. Ogunlaja then asked, "Is there any way you can receive some money for me if they were to wire it to your account?" and Billie responded "David, I did not want to believe this, but I think you are trying to scam me." *Id.* The conversation then tapered off, with Mr. Ogunlaja sending various miscellaneous texts like "merry Christmas" and "happy new year." *Id.* He tried to contact her again in March of 2019, but she did not respond.

**Exhibit 4: Compilation of Photos from Mr. Ogunlaja's Phone**

Exhibit 4 ("Exh. 4") is an extraction from the iPhone 11 that contains screenshots of messages Mr. Ogunlaja received on September 17, 2019, which contain the social security number, date of birth, and location of an individual named "Rashaune Groome." Exh. 4 at 1. There is also a picture of a license taken on September 17, 2019, with the name "Rashaun Croom." *Id.* at 2. The exhibit further contains a photograph, taken on July 12, 2021, of a credit card belonging to Mazeedat Oredein. *Id.* at 1. Additionally, there is a photograph, taken on September 26, 2018, of the back of a credit card. There is also a photograph, apparently dated December 31, 1979, of a passport belonging to Adesakin Adepapo. *Id.*

**Exhibit 5: Ogunlaja's conversations about allegedly fraudulent bank transfers**

Exhibit 5 ("Exh. 5") is an extraction from the iPhone 11 that shows two sets of text messages sent to Mr. Ogunlaja from the phone number 234-808-024-4453 and a contact named "Mr. Sodiq." The conversation with the unknown number spans from May 20, 2020 to May 21, 2020. The unknown number sent Mr. Ogunlaja a message saying, "but acct de always dey my hand I get one off my guy way de always do direct deposit for the account sometimes." Exh. 5 at 1. In response to a text from Mr. Ogunlaja which reads, "you get client aza?" the unknown phone

number replied, "Morning do u need boa," and then sent, "client full name: Robert Dean Meyer." *Id.* The conversation with "Mr. Sodiq" occurred on December 19, 2018. On that date, Mr. Sodiq sent a message saying, "I did a transfer of $5000 and its not in her account yet. And she need some Cash URGENTLY." Mr. Ogunlaja responded, "I can do that but need to get it back before rent is due by January." Mr. Sodiq then gave details for a bank account under the name of "Strata Explorations, Inc." *Id.* at 2.

**Exhibit 6: Mr. Ogunlaja's Conversation with 27659019871@s.whatsapp.net**

Exhibit 6 ("Exh. 6") is an extraction from the iPhone SE in which Mr. Ogunlaja is messaging with an unknown user. The messages are from January 2021. The unknown user asked Mr. Ogunlaja for a Wells Fargo account for a "150k job," an account for a "30k transfer from a client," an account to receive a $99,000 federal tax refund, and a "bizo acct for 250k sba." Exh. 6 at 2, 9, 21, 25. Mr. Ogunlaja provided account details for business and personal bank accounts. *Id.* at 3, 22. They also discussed the distribution of proceeds for the "shooter" and the "middleman." *Id.* at 15–16. The exhibit also contains screenshots of messages sent to Mr. Ogunlaja with other people's bank account information. *Id.* at 29, 34. There are also screenshots of bank account balances and a federal tax refund. *Id.* 30–33.

**Exhibit 7: Mr. Ogunlaja's Conversation with "IBB"**

Exhibit 7 ("Exh. 7") is an extraction from the iPhone SE containing Mr. Ogunlaja's communications with someone identified as "IBB." The texts are from January 2021 to June 2021. They discussed how to log into a bank account and "IBB" sent Mr. Ogunlaja the information for several bank accounts. Exh. 7 at 11, 14, 20, 25 67. Mr. Ogunlaja sent the details of different bank accounts as well. *Id.* at 26, 27, 28, 35, 68. They discussed being the "middleman" for one transaction. *Id.* at 15, 16. The exhibit also contains screenshots of bank account balances and

information that "IBB" and Mr. Ogunlaja sent to each other. *Id.* at 49, 56, 58, 60, 64, 66, 69. One of the screenshots of a bank account contains a message that says, "TD bank hot cake," with three fire emojis. *Id.* at 66. There is a transfer receipt for 78,000 naira (Nigerian currency) dated May 20, 2021. *Id.* at 51 (repeated at 61). There are also screenshots of messages from "Mr. IB" and "SirBikos" that discuss bank transfers. *Id.* at 53–54, 57, 59, 68, 70. There is one picture of a driver's license belonging to Ricky Isbell. *Id.* at 55. There is also a transfer receipt for $3,250 dated June 15, 2021. On page 62, there is a screenshot of a message that says "If your client can receive credit card, go store and spend it … DM WITH ADDRESS." There is a screenshot of a search result for "green dot ach routing." *Id.* at 65.

**Exhibit 8: Mr. Ogunlaja's Conversation with 46762482218@s.whatsapp.net**

Exhibit 8 ("Exh. 8") contains messages between Mr. Ogunlaja and an unknown user from July 2020. The unknown user told Mr. Ogunlaja he needed to "chop small" some funds from apparent romance fraud victims and sent information for several bank accounts. Exh. 8 at 1–4. There were two batches of funds: $33,000 associated with "Rendy" in a Huntington Bank account and $25,000 associated with "Carrie" in a Bank of America account. The unknown user provided screenshots of text message conversations with Carrie and Rendy in which he directed Carrie to buy bitcoin using the money in her account and advised Rendy that money will be coming into their account. *Id.* at 17–26. Mr. Ogunlaja appears to be the one who sent the funds to the accounts, and he discussed splitting his share of the profit with the unknown user. *Id.* at 9.

**Exhibit 9: Mr. Ogunlaja's Conversation with "Jamo"**

Exhibit 9 ("Exh. 9") is an extraction from the iPhone SE that contains messages between Mr. Ogunlaja and someone called "Jamo" from April 2020. Mr. Ogunlaja sent "Jamo" bank account information for several accounts and discussed the percentages for how to distribute the

funds. Exh. 9 at 1–4. "Jamo" referred to Mr. Ogunlaja as Papas. *Id.* There is a screenshot of a Wells Fargo bank account balance and a receipt for a wire transfer of $112,446.69 to "Red Knight Real Estate Partners." *Id.* at 7–8.

### Exhibit 10: Identity Documents on the iPhone SE

Exhibit 10 ("Exh. 10") is an extraction from the iPhone SE that contains a compilation of approximately 115 photos of drivers' licenses, Social Security cards, and passports.

## LEGAL STANDARD

Federal Rule of Evidence 404(b)(1) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," provided that a prosecutor "provide[s] reasonable notice of any such evidence . . . so that the defendant has a fair opportunity to meet it," "articulate[s] in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose," and "do[es] so in writing before trial," unless the court excuses lack of pretrial notice. Fed. R. Evid. 404(b)(2)–(3). "The list of proper purposes is illustrative, not exhaustive, and Rule 404(b) is considered to be an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition." *United States v. Tan*, 254 F.3d 1204, 1208 (10th Cir. 2001) (internal quotations omitted).

> Evidence is properly admitted under Rule 404(b) if four requirements are met: (1) the evidence was offered for a proper purpose under Fed. R. Evid. 404(b); (2) the evidence was relevant under Fed. R. Evid. 401; (3) the probative value of the evidence was not substantially outweighed by its potential for unfair prejudice under Fed. R. Evid. 403; and (4) the district court, upon request, instructed the jury

> pursuant to Fed. R. Evid. 105 to consider the evidence only for the purpose for
> which it was admitted.

*United States v. Becker*, 230 F.3d 1224, 1232 (10th Cir. 2000) (citing *Huddleston v. United States*, 485 U.S. 681, 691–92 (1988)). Crucially, "evidence is admissible under Rule 404(b) only if it is relevant for a permissible purpose and that relevance does not depend on a defendant likely acting in conformity with an alleged character trait." *United States v. Commanche,* 577 F.3d 1261, 1267 (10th Cir. 2009).

To determine the relevance of a prior bad act, courts also look to the similarity of the prior act to the charged offense*. United States v. Brooks*, 736 F.3d 921, 940 (10th Cir. 2013). The Tenth Circuit has noted that "when the extrinsic act is offered to show 'intent to commit the offense charged, the relevancy of the extrinsic offense derives from the defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic and charged offenses.'" *United States v. Tennison*, 13 F.4th 1049, 1057 (10th Cir. 2021) (quoting *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978)). In addition, the Court has "identified several non-exclusive factors to consider when assessing similarity," including "'(1) whether the acts occurred closely in time; (2) geographical proximity; (3) whether the charged offense and the other acts share similar physical elements; and (4) whether the charged offense and the other acts are part of a common scheme.'" *United States v. Davis*, 636 F.3d 1281, 1298 (10th Cir. 2011) (quoting *United States v. Mares*, 441 F.3d 1152, 1158 (10th Cir. 2006)).

Federal Rule of Evidence 403 allows a trial court to exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Exclusion under Rule 403 is an "extraordinary remedy" to be used "sparingly." *United States v. Rodriguez,* 192 F.3d 946, 949 (10th Cir. 1999). To be unfairly prejudicial, evidence must be likely

to provoke an emotional response in the jury or "otherwise tend[] to affect adversely the jury's attitude toward the defendant wholly apart from its judgement as to his guilt or innocence of the crime charged." *United States v. Tan,* 254 F.3d 1204, 1211–12 (10th Cir. 2001). The Tenth Circuit has further noted that "evidence of prior acts can have the effect of confusing the issues in a case." *United States v. Guardia,* 135 F.3d 1326, 1330 (10th Cir. 1998). Ultimately, "the decision to exclude evidence under Rule 403 is within the sound discretion of the trial court." *Id.* at 1331.

**DISCUSSION**

**1. There is sufficient evidence to find that the iPhone 11 and iPhone SE belonged to Mr. Ogunlaja.**

Mr. Ogunlaja first argues that the government cannot show that the iPhones from which the exhibits were extracted belonged to him. Doc. 110 at 5. Accordingly, he argues that the evidence cannot meet the threshold relevance and reliability standard required for 404(b) evidence. *Id.* Mr. Ogunlaja also argues that the forensic reports regarding the phones "do not contain any information that would allow the court to know, for example, how that information came to be on the phone, or whether the text message and photographs were written or captured by the phone or downloaded onto the phone intentionally or automatically." *Id.* at 5–6.

"[S]imilar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." *Huddleston,* 485 U.S. at 689. Questions of relevance conditioned on a fact fall under Federal Rule of Evidence 104(b). *Id.* "In determining whether the Government has introduced sufficient evidence to meet Rule 104(b), the trial court neither weighs credibility nor makes a finding that the Government has proved the conditional fact by a preponderance of the evidence." *Id.* Instead, "the court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact . . . by a preponderance of the evidence." *Id.* In the instant case, there are several facts connecting the

iPhone 11 to Mr. Ogunlaja and connecting the iPhone SE to the iPhone 11, such that a jury could reasonably find that both phones belonged to Mr. Ogunlaja.

First, FBI computer scientist Mr. Nguyen was able to determine that the iPhone 11 had a user-defined name of "Olutayo's iPhone." When he examined the contents of the phone, he discovered a COVID lab test, a visa rejection form, a social security card, and a roofing quote, all bearing Mr. Ogunlaja's name. The COVID lab test and the visa form listed Mr. Ogunlaja's email as dankupapas@gmail.com, which was also the email associated with Instagram and Snapchat accounts on the phone. Based on the name "Olutayo's iPhone" and the presence of personal documents containing Mr. Ogunlaja's name and email, as well as the presence of applications using Mr. Ogunlaja's email, the jury could more than reasonably conclude that the iPhone 11 belonged to Mr. Ogunlaja.

Next, Mr. Nguyen also analyzed the iPhone SE and found that the iPhone SE and iPhone 11 had overlapping MSISDNs and ICCIDs, which indicated to him that "the user had inserted the same SIM card with same mobile number on both devices." Doc. 165 at 17:12–20. Both the iPhone SE and the iPhone 11 had been used to access six of the same email accounts. Furthermore, the iPhone 11 had a Tinder application installed and was used to access it, but the contact number for the Tinder account was the phone number of the iPhone SE. Accordingly, Mr. Nguyen concluded that "two-factor authentication was being used on the iPhone SE to access the Tinder account installed on the iPhone 11 and that the users are most likely the same." *Id.* at 19:1–4. Both devices had connected to identical Wi-Fi access points as well as the same Bluetooth devices and one of the Wi-Fi access points was named "Olutayo85." Lastly, and most significantly, Agent vanBrandwijk used the same PIN code to unlock both phones. From these connections, the jury

could reasonably accept his conclusion that the iPhone 11 and the iPhone SE had the same user, namely Mr. Ogunlaja.

Mr. Ogunlaja's argument that the evidence is unreliable because the Court cannot determine whether the evidence was downloaded onto the phone by someone other than Mr. Ogunlaja is unconvincing. First, Mr. Ogunlaja does not cite to, and the Court has not found any, authority barring admission of Cellebrite extractions because it is unclear from the reports whether the evidence was downloaded onto the phone intentionally, accidentally, or from some other source. If, as stated above, the jury could reasonably find that the phones belonged to Mr. Ogunlaja, the jury could also reasonably conclude that he either created the content on the phone, downloaded the content, or otherwise knew about the content on the phones. Mr. Ogunlaja may challenge this conclusion at trial, but the Court will not exclude the evidence based on Mr. Ogunlaja's assertion that it is unclear whether the evidence was downloaded onto the phone by someone other than Mr. Ogunlaja.

### 2. Exhibits 1 to 3, Mr. Ogunlaja's other romance scams, are admissible under Rule 404(b).

As described above, Exhibit 1 shows that from December 2018 to November 2020, Mr. Ogunlaja attempted to perpetrate a romance scam on M.J.S. by posing as "Tracy Williams" and telling M.J.S. that he was stuck in Malaysia and needed money to get out. Exhibit 2 shows Mr. Ogunlaja's attempted perpetration of a romance scam on "Jane Doe" from December 2018 to January 2019, where he also claimed to be doing work in Malaysia. Exhibit 3 shows Mr. Ogunlaja's attempted perpetration of a romance scam on "Billie" from December 2018 to March 2019.

Applying the *Huddleston* test, first, the evidence is offered for a proper purpose, namely, to show that Mr. Ogunlaja knew that the $40,000 transferred to him from B.D. was part of a romance fraud. The evidence also tends to disprove the theory that Mr. Ogunlaja received the funds

to purchase a car. Relevant here, since Mr. Ogunlaja is charged with a conspiracy, the government must prove that "(1) a conspiracy existed, (2) the defendant knew the essential objectives of the conspiracy, and (3) the defendant knowingly and voluntarily became a part of it." *United States v. Horn,* 946 F.2d 738, 740 (10th Cir. 1991). Thus, evidence that Mr. Ogunlaja used the same tactics to defraud potential victims (meeting on a dating site and claiming to need money because he is stuck in Malaysia), would tend to show that he knew of Mr. Olawuyi's scam upon B.D. and received the $40,000 into his account fraudulently. While the defense argues that a *subsequent* act cannot be used to prove intent or knowledge of the charged conduct, the Tenth Circuit does not distinguish between subsequent and prior acts for purposes of Rule 404(b) and in fact has found that subsequent acts can be probative of intent or knowledge. *Mares,* 441 F.3d at 1158.

Next, the evidence is relevant. As the Tenth Circuit has noted, a prior or subsequent act is especially relevant if it is similar to the charged conduct. *Brooks,* 736 F.3d at 940. Here, the defense argues that the other romance frauds are not similar to the charged conduct because Mr.  Ogunlaja is merely being charged with receiving funds from B.D., taking a 10 percent cut of the $40,000, and then transferring the money to other accounts. However, the Indictment alleges a conspiracy, which includes Mr. Olawuyi's perpetration of a romance fraud with remarkably similar facts to the romance frauds perpetrated by Mr. Ogunlaja. Both used a fake romantic relationship to defraud victims into sending money, both claimed to be working in Malaysia, and both instructed the victims on how to wire the money. Doc. 102 at 3; Exh. 1 at 16–19, 21–22, 65–68; Exh. 2 at 3; Exh. 3 at 1. *Davis,* 636 F.3d 1281 (courts should consider whether other acts and charged offense share physical elements). As discussed above, the government must prove that Mr. Ogunlaja knew about the conspiracy; therefore, the prior romance frauds are highly relevant to this element, even if Mr. Ogunlaja's role in the instant conspiracy was more limited. Looking to temporal proximity, the

attempted romance scams took place 2 to 3 years after the conduct charged in the Indictment. Although the defense points to several cases where the Tenth Circuit admitted other act evidence that occurred immediately before or after the charged conduct, the Tenth Circuit has been clear that there is "no absolute rule regarding the number of years that can separate offenses." *United States v. Henthorn,* 864 F.3d 1241, 1249 (10th Cir. 2017). Instead, courts must apply "a reasonableness standard and examine[] the facts and circumstances of each case." *Id.* For instance, in *Henthorn,* a 17-year gap between the death of the defendant's first wife and the death of his second wife, for which he was charged with murder, was mitigated by the "marked similarities between the incidents." *Id.* at 1251; *see also Mares,* 441 F.3d at 1158 (arrest one year after charged conduct was admissible 404(b) evidence). In the same vein, the two-to-three-year gap between the subsequent acts and charged conduct is mitigated by the similarity of the acts. *United States v. Zamora,* 222 F.3d 756, 762 (10th Cir. 2000) ("The more similar the act or state of mind is to the charged crime, the more relevant it becomes.").

The perpetration of a romance fraud with similar facts to the one charged in the Indictment is highly probative of Mr. Ogunlaja's knowledge of the conspiracy and intent to receive the funds under a fraudulent scheme. Mr. Ogunlaja argues that the risk of unfair prejudice is especially heightened because the government has no other evidence linking him to Mr. Olawuyi and thus there is a significant chance that the jury will convict him because he may have committed fraud in other instances. While the Court is sensitive to Mr. Ogunlaja's concerns, the Court notes that the alleged lack of other evidence regarding the charged conduct heightens the probative value of the other act evidence. Due to the significant probative value of the other act evidence, the Court cannot conclude that the probative value is substantially outweighed by the risk of unfair prejudice. Furthermore, any prejudice would be mitigated by a limiting instruction that details the purposes

for which the evidence may be considered. *United States v. Martinez,* 749 F. App'x 698, 712 (10th Cir. 2018) (prejudice from highly similar extrinsic acts was mitigated by limiting instruction). Thus, the Court finds that Exhibits 1 to 3 are admissible.

### 3. Exhibits 4 to 10 are admissible 404(b) evidence, but the Court will reserve ruling on Rule 403 objections to cumulative evidence.

Taken together, Exhibits 4, 5, 6, 7, 8, 9, and 10 consist of conversations and phone contents that show Mr. Ogunlaja frequently utilizing other individuals' identities and bank accounts, allegedly as part of other international fraud schemes. The Court ultimately finds that the evidence in these exhibits is admissible under Rule 404(b), but given the volume of the evidence, the Court will reserve ruling on the defense's Rule 403 objections and will assess the potential prejudice or cumulativeness of the evidence at trial.

Similar to the evidence of prior romance frauds, the evidence of bank account transfers, possession of identity documents, and discussion of roles and payouts in a scheme are introduced for the proper purpose of showing that Mr. Ogunlaja knew that the $40,000 transferred to him from B.D. was part of a romance fraud. Fed. R. Evid. 404(b)(2) (extrinsic acts admissible to show intent and knowledge). In particular, the evidence shows that Mr. Ogunlaja has experience with and knowledge of the structure and functioning of international fraud schemes. Relevant here, Agent vanBrandwijk testified to the structure of international wire fraud schemes. He described that the person who has control over an account or directs the individual to distribute funds from an account is called the "shooter." The "middleman" or "money mule" supplies bank accounts to which the shooter can send funds. The middleman normally takes a percentage of the funds. The "picker" is the person designated to pick up the distributed cash at the bank and is generally entitled to a smaller share of the proceeds. Doc. 165 at 85:2–17. When testifying about Exhibits 5 to 9, Agent vanBrandwijk concluded that the conversations regarding bank account numbers indicate that Mr.

Ogunlaja frequently acts as a "middleman," by providing bank account information and taking a percentage of the money. Indeed, in some of the messages, Mr. Ogunlaja explicitly discusses the division of proceeds between the "shooter," the "middleman," and the "picker." *See* Exh. 7 at 15–16; Exh. 6 at 15–16. Further, Agent vanBrandwijk explained the meaning of various terminology employed in the messages. For instance, in Exhibit 6, the unknown user sent a message to Mr. Ogunlaja saying "Sure 150k job." Exh. 6 at 2. Agent vanBrandwijk testified that, based on his experience investigating international fraud schemes, this message meant "this is a sure thing. I have a \$150,000 scheme for us to profit from." Doc. 165 at 90:19–22; *see also* Doc. 165 at 88:23–15 (interpreting messages like "You get client aza" to refer to the bank accounts of unwitting money mules). Thus, Exhibits 5 to 9, which contain various conversations between Mr. Ogunlaja and other individuals discussing the bank account information of numerous accounts belonging to other people, show that Mr. Ogunlaja has experience with and a working knowledge of international fraud schemes.

With respect to Exhibits 4 and 10, which contain photographs of identification documents belonging to other people, Agent vanBrandwijk testified that in the context of international fraud schemes, a collection of other people's identification documents would be used to create online bank accounts, for the registration of fictitious businesses, and for the creation of other accounts to use in schemes to defraud, such as bitcoin accounts. Doc. 165 at 106:18–25. This evidence therefore is proper to show Mr. Ogunlaja's knowledge and experience with international fraud schemes, specifically acting in the role of a middleman, as is alleged in the Indictment.

Furthermore, the evidence is relevant. Mr. Ogunlaja is charged with acting as a money mule in Mr. Olawuyi's romance fraud and the evidence in Exhibits 4 to 10 indicate that he has frequently played this exact role in other international fraud schemes. Thus, the evidence makes it more likely

that when Mr. Ogunlaja received the $40,000 from B.D., he "indulg[ed] himself in the same state of mind" that he had when participating as a middleman in other international fraud schemes. *Brooks,* 736 F.3d at 940. Importantly, the acts in Exhibits 4 to 10 span from 2018 to 2021. Mr. Ogunlaja argues that the acts are too remote in time from the charged conduct, which occurred in 2016. However, as the Court has noted above, there is no absolute rule regarding the temporal proximity of extrinsic acts; courts must examine the facts of each case individually. *Henthorn,* 864 F.3d at 1249. Admittedly, the evidence here is not so close in time to the charged conduct as other extrinsic acts that have been deemed admissible by the Tenth Circuit. *See Martinez,* 749 F. App'x at 712 (extrinsic acts that occurred within three months of charged conduct were admissible); *Davis,* 636 F.3d at 1289 (extrinsic act that occurred a year after the charged conduct was admissible). Nevertheless, the Court finds it significant that the evidence in Exhibits 4 to 10 and the charged conduct appear to part of an ongoing pattern of conduct in which Mr. Ogunlaja involves himself in various international schemes. *Davis,* 636 F.3d at 1298 (relevance is heightened when extrinsic acts and charged conduct are part of a common scheme); *see also Brooks*, 736 F.3d at 940 (noting that, to determine the relevance of a prior bad act, courts look to the similarity of the prior act with the charged offense)*.* Therefore, the two-to-five-year gap between the charged conduct and the extrinsic acts is mitigated by the consistent and ongoing participation in fraud schemes.

Of course, where, as here, the extrinsic acts are highly similar to the charged conduct, there is a risk that the jury may convict the defendant because he is the type of person to engage in this particular behavior. However, exclusion under Rule 403 is "an extraordinary remedy" that must be used "sparingly." *Rodriguez,* 192 F.3d at 949. And to be unfairly prejudicial, the evidence must affect the jury's attitude to the defendant "wholly apart from its judgment as to his guilt or

innocence of the crime charged." *Tan,* 254 F.3d at 1211–12. Given the significance of the evidence in Exhibits 4 to 10, which demonstrate Mr. Ogunlaja's familiarity and experience with international fraud schemes and make it more likely that his intent in the instant offense was fraudulent, the Court cannot conclude that such evidence would affect the jury's judgment *wholly apart* from its determination of guilt or innocence. As noted above, any potential prejudice can be mitigated by a limiting instruction.

Rule 403 also allows a trial court to exclude evidence when the probative value is substantially outweighed by the danger of "needlessly presenting cumulative evidence." Fed. R. Evid. 403. Exhibits 4 to 10 contain 244 pages of messages and photographs that are in many instances repetitive. As both parties have alleged that the government's case rests on proving Mr. Ogunlaja's intent primarily through other act evidence, there is a substantial risk that the presentation of some of this evidence will be needlessly cumulative and will serve only to paint a negative picture of Mr. Ogunlaja. Because the Court cannot assess at this time what evidence will be cumulative, the Court will take up specific 403 objections at trial. Lastly, the Court notes that one of the photographs of an identification document in Exhibit 4 shows that the photograph was taken on December 31, 1979. Exh. 4 at 2. The government has not provided any explanation for this date but noted that sometimes dates may get mixed up when photographs are sent or downloaded. In order to avoid confusing the issues for the jury, the Court will order the government to remove this photograph from Exhibit 4. This will not significantly impact the government's evidence as there are over 100 other photographs of identification documents in the exhibits.

## CONCLUSION

The Court finds that Exhibits 1 to 3, which show Mr. Ogunlaja attempting to engage in other romance frauds, are admissible other act evidence under Rule 404(b). Furthermore, Exhibits 4 to 10, which are indicative of Mr. Ogunlaja acting as a money mule in other international fraud schemes, are highly probative of his fraudulent intent and are relevant 404(b) evidence. Given the volume of messages and photographs in Exhibits 4 to 10, the Court will take up specific Rule 403 objections as to this evidence at trial.

**IT IS THEREFORE ORDERED** that the government's Motion in Limine to Admit 404(b) Evidence [Doc. 102] and the government's Second Motion in Limine to Admit 404(b) Evidence [Doc. 120] are granted, consistent with this Memorandum Opinion and Order.

**IT IS FURTHER ORDERED** that the government shall remove the photograph dated 12/31/1979 from Exhibit 4.

ENTERED this 30th day of July 2024.

_____
MARTHA VÁZQUEZ
SENIOR UNITED STATES DISTRICT JUDGE