## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                       No. 20-CR-2124 MV

OLUTAYO OGUNLAJA, ABEL DARAMOLA

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER is before the Court on Mr. Daramola's Amended Motion to Dismiss for Violations of Brady v. Maryland [Doc. 228], which Mr. Ogunlaja joined [229]. Having considered the briefs and relevant law, and being otherwise fully informed, the Court finds that at this time the Motion is not well-taken and will be denied.

## BACKGROUND

### 1.  The Alleged Crime

On December 2, 2020, Joseph Oloaosebikan Olawuyi (a.k.a. Ibrahim Musa/Glenn Brown), Olutayo Sunday Ogunlaja, Gbemileke Bello, Adesuwa Renee Ogiozee, and Abel Adeyi Daramola, were indicted in the District of New Mexico. Doc. 1. The Indictment alleges that from approximately January 2016 through November 2016, Defendants knowingly, unlawfully, and willfully conspired to commit wire fraud, in violation of 18 U.S.C. § 1343, and aiding and abetting, in violation of 18 U.S.C. § 2. *Id.*

According to the Indictment, in January of 2016, Mr. Joseph Olawuyi used the online persona "Glenn Brown" to register on eHarmony.com. *Id.* at 3. Acting as "Glenn Brown," he began a romantic relationship with the victim, B.D., who was a resident of New Mexico. *Id.* He told B.D. that he was working to repair roads in Malaysia. *Id.* For instance, in one email sent on January 13,

2016, Mr. Olawuyi said "Just in case you should know that I'm currently in Southeast Asian [sic], Malaysia I've been working out here off and on for 1 year. I am working on a road construction project." Doc. 102 at 2. Gradually, Mr. Olawuyi began to inform B.D. that his business was presenting financial challenges. *Id.* In one email he stated, "I had such a lousy dat [sic] discussing issues with my staffs [sic] about the finishing of the project and what may be needed or what is not required for the finish up" and after explaining that he had issues with investors he added "my savings wasn't enough to pull off the project." *Id.* Eventually, he started expressly asking for money. *Id.* After describing financial issues with the road project, he stated "I have seen the worse, starvation should not rip my life off. I just needed the balance of $36,500 . . . Today, you can try to wire $15,000. Next week on Tuesday you can then wire the remaining $20,000. Or you could even make it another $10,000 then Wednesday you can wire the remaining $10,000." *Id.* at 3. He explained that "if you should do it this way, you will be less worried and the bank won't question you so much . . . if you tend to wanna wire the whole $36,500, the bank will be too concern. Let not raise so much alarm." *Id.* Mr. Olawuyi promised B.D. that he would pay her back once he was able to get back to the United States. *Id.*

Utilizing his story that he was stuck in Malaysia and needed money to get out, Mr. Olawuyi repeatedly provided B.D. with information for various bank accounts and requested that she transfer money to those accounts. *Id.* He also asked B.D. to send him gift cards. *Id.* In total, in response to Mr. Olawuyi's requests, B.D. transferred approximately $558,500 to various bank accounts. Doc. 1 at 3-9. Of particular relevance here, in response to Mr. Olawuyi's requests, B.D. wired to Mr. Ogunlaja a total of $40,000 and to Daramola cars a total of $28,000. Doc. 102 at 4.

Mr. Olawuyi was never apprehended on the charges in the instant case because he remained in Malaysia and then eventually returned to Nigeria. Since the issuance of the Indictment, he has

not entered the United States. Ms. Bello entered into a pretrial diversion agreement with the government. Doc. 132 at 1. The government dismissed the charges against Ms. Ogiozee. Docs. 176, 183. Mr. Ogunlaja and Mr. Daramola are set to appear for trial on December 16, 2024. Doc. 205.

On August 7, 2024, Mr. Olawuyi gave an interview at the office of the Nigerian Police Force in Lagos, Nigeria. Second Motion in Limine, Doc. 207-1 at 1. FBI Special Agent Miriam Oviedo-Clark conducted the interview. *Id.* Present during the interview was FBI Foreign Service National Investigator Ayotunde Solademi, Deputy Commissioner of Police Martin Nwogo, and Investigating Police Superintendent Abbass Gadzama. *Id.* An FBI 302 report summarizing the interview was included with Mr. Daramola's Motion. *Id.* A full recording of the interview was provided by the government in advance of the pretrial conference. *See* Government's First Amended Exhibit List 19. Following the pretrial conference, Mr. Daramola's counsel provided the Court with a transcript of the interview.

Mr. Olawuyi gave the interview voluntarily, as he was not in custody at the time and was free to leave the office at any point. November 21, 2024, Pretrial Conference Hearing Transcript ("H'rg Tr.") at 102:5-15. [1] He was informed of his rights and consented to waive them. Doc. 207-1 at 1 (Second Motion in Limine); Doc. 230-1 at 4:11-5:2. During the interview, Mr. Olawuyi admitted that he personally talked two women into sending him money. Doc. 230-1 at 11-13, 14-15.[2] Specifically, when SA Oviedo-Clark informed him that "it was reported that you convinced your American lover to transfer $560,000 to Ogiozee's account for a Mercedes Benz" he replied

---

[1] The Court's citations to the transcript refer to the court reporter's original, unedited version; any final transcripts may contain slightly different page and/or line numbers.
[2] The transcript of the recording was provided to the Court as a supplement to the Motion to Dismiss for *Brady* Violation. Doc. 230-1.

that the only transaction with Ogiozee was for $50,000 and that the money came from two different sources. *Id.* at 12-13. An unidentified male asked Mr. Olawuyi, "the $50,00, what did you get it for? Who did you get it for?" *Id.* at 14:21–22. Mr. Olawuyi replied that "at the time, eight years ago, yeah, I was into internet fraud, clearly, so I – I got it from the internet, the internet." *Id.* at 14:23-25. The unidentified male asked "Who in particular? Is it from two different people?" to which Mr. Olawuyi replied, "Yeah, two different people." *Id.* at 15:1-3. As the conversation progressed, Mr. Olawuyi admitted, "Yes, I scammed people in the past, which I own up to, which I knew it was terrible. I wish I could turn back the hands of time, but it's unfortunate." *Id.* at 16:5-8. When discussing the details of his prior scams on two women, Mr. Olawuyi stated that "I can remember a lady called Brenda, yeah, so that's the only thing I could remember." *Id.* at 17:9-10. He explained that he had Brenda (the victim in this case) and another victim send money to different accounts. *Id.* at 20:5-14.

In particular, Mr. Olawuyi described that "when you had someone to help you receive money, there's a (inaudible) and fourth party and a fifth party. You wouldn't know. You only did it with the person you know. So I wouldn't know how far the whole transaction were to go." Doc. 230-1 at 20:7-11; *see also id.* at 40:17-41:1 (describing that he did not know who his intermediaries were involved with in the United States so he did not know everyone who received money as part of the fraud schemes). Regarding the structure of the scam upon the victim in this case Mr. Olawuyi stated that some of the people who received money from the victim did not know where the money was coming from. *Id.* at 29:14-18. In another statement, he described a transaction where the individual receiving money did not know that money was being put into her account. *Id.* at 22:21-23:6. He also described another fraudulent transaction in which a victim sent money to an individual who then passed the money on to a car dealer. *Id.* at 23:15-24:1.

Relevant here, Mr. Olawuyi was asked if as part of the two romance frauds he perpetrated he ever sent money to Daramola Cars. *Id.* at 28:20-21. Mr. Olawuyi stated that he did not and when asked again he said, "Yeah never had to do with anything—they are separate from this (inaudible)." *Id.* at 28:22-29:1. He then stated that Daramola Cars was not the car dealer involved in the transaction with Ogiozee and that he had never heard of it before. *Id.* at 29:2-9. Mr. Olawuyi also discussed how he knew Mr. Ogunlaja and described Mr. Ogunlaja's involvement in the instant offense. *Id.* at 26:16-17, 31:25-32:1, 32:20, 36:7-8, 39:23-24.

At a November 21, 2024 hearing, the government gave some additional information regarding the context of the FBI interview with Mr. Olawuyi. Mr. Olawuyi is not currently in custody in Nigeria and gave the interview voluntarily. H'rg Tr. at 101:20-24. It appears that he was briefly detained after Ms. Ogiozee made a claim against him under Nigerian law, but the government was unable to say for how long he was detained or when he was released. *Id.* at 101:12-15. Ms. Ogiozee's allegation was based on him transferring her fraudulent money, which led to her being charged in the instant case. *Id.* According to the government, the Nigerian government is not currently prosecuting Mr. Olawuyi on these charges, but retains the right to do so. The United States cannot extradite him while Nigeria retains the right to prosecute. *Id.* at 101:25-102:4, 102:18-19. In addition, the FBI represented that it may be disrespectful to the Nigerian government and harmful to diplomatic relationships to even ask Mr. Olawuyi to travel to the United States to face charges. *Id.* at 113:14-21.

The government asserts that the FBI 302 report summarizing the interview was approved on September 3, 2024 and became available to the FBI agents in the United States and government counsel on September 4, 2024. Doc. 235 at 7. The government sent the 302 report to Mr. Ogunlaja's counsel on September 4, 2024. *Id.* At that time, Mr. Daramola had entered into a plea

agreement with the government. Doc. 187. The Court rejected Mr. Daramola's plea agreement on September 12, 2024. *Id.* Mr. Daramola's counsel received the 302 report from Mr. Ogunlaja's counsel that same day. Doc. 235 at 8. The recording of the interview arrived at the FBI office in the United States via international mail sometime between October 27, 2024 and November 13, 2024.[3] The case agent first saw the recording on his desk on November 13, 3024 and shared it with government counsel that same day. *Id.* On November 4, 2024, Mr. Daramola withdrew his guilty plea. Doc. 201. On November 14, 2024, the government disclosed the additional discovery of Mr. Daramola's bank account records. Doc. 228 ¶15. On November 15, 2024, the government disclosed the recording of the interview with Mr. Olawuyi to counsel for both Mr. Ogunlaja and Mr. Daramola. Doc. 235 at 8.

On December 4, 2024, Mr. Daramola filed the instant Motion to Dismiss. Doc. 225. Later that day, he filed an Amended Motion to Dismiss and Mr. Ogunlaja joined the Motion. Docs. 228, 229. On December 5, 2024, at the Court's direction, Mr. Daramola filed a supplemental Motion delineating what specific statements from Mr. Olawuyi's interview the original and amended Motion to Dismiss referenced as "exculpatory." Doc. 230. On December 9, 2024, the government responded. Doc. 235. On December 11, 2024, Mr. Daramola replied. Doc. 242.

## LEGAL STANDARD

Due process requires that the prosecution turn over any evidence favorable to an accused and material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *United States v. Reese*, 745 F.3d 1075, 1083 (10th Cir. 2014). "To establish a *Brady* violation, a defendant must demonstrate that (1) the prosecutor suppressed evidence; (2) the evidence was favorable to the

---

[3] According to the government, this is a typical timeframe for international interoffice mail. The case agent could not be more specific about the exact date of arrival because he was out of the office between October 26, 2024 and November 12, 2024.

defendant as exculpatory or impeachment evidence; and (3) the evidence was material." *United States v. Walters*, 269 F.3d 1209, 1214 (10th Cir. 2001).

Evidence is material if "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 470 (2009). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Nuckols v Gibson*, 233 F.3d 1261, 1267 (10th Cir. 2000) (citations omitted). Put another way, *Brady's* materiality threshold is met if the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). The Tenth Circuit has also stated that evidence is material if it "might meaningfully alter a defendant's choices before and during trial…" *Case v. Hatch*, 731 F.3d 1015, 1041 (10th Cir. 2013) (quoting *United States v. Burke*, 571 F.3d 1048, 1054 (10th Cir. 2009)). The evidence must be evaluated "in light of the entire record." *Madrid v. Wilson*, 590 Fed.Appx. 773, 778 (2014) (citation omitted). A finding of materiality requires that "prejudice must have ensued." *Douglas v. Workman*, 560 F.3d 1156, 1173 (10th Cir. 2009).

Whether the suppression of evidence was done in good or bad faith is irrelevant for *Brady* purposes. *Fero v. Kerby*, 39 F.3d 1462, 1472 (10th Cir. 1994). The burden is on the government to produce exculpatory evidence, and the duty to disclose is not predicated on the defendant knowing such evidence exists or asking for such evidence. *See Kyles*, 514 U.S. at 437; *United States v. Baca*, No. CR 16-1613 JB, 2020 WL 1289508, at *6 (D.N.M. Mar. 18, 2020). The government's duty to disclose continues throughout the judicial process. *See Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997).

"In a typical case involving an alleged *Brady* violation… the purported *Brady* material is not disclosed until after trial." *Burke*, 571 F.3d at 1053. The Tenth Circuit has nevertheless

recognized that "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in *Brady*." *Id.* at 1053-55; (finding no *Brady* violation because evidence was disclosed *during* trial) (citing *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983) ("No denial of due process occurs if *Brady* material is disclosed to appellees in time for its effective use at trial.")). Specifically, the Tenth Circuit has held that "the belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an earlier disclosure would have created a reasonable doubt of guilt." *Id.* Due Process is satisfied "[a]s long as ultimate disclosure is made before it is too late for the defendant[] to make use of any benefits of the evidence." *United States v. Warhop*, 732 F.2d 775, 777 (10th Cir. 1984). If a court finds that there has been a *Brady* violation, the court must fashion a remedy. *See Burke*, 571 F.3d at 1055.

## DISCUSSION

Mr. Daramola asserts two violations. First, Mr. Daramola asserts that the government's handling of Mr. Olawuyi's interview recording and FBI 302 summary report is a *Brady* violation. Doc. 228 at 7. Second, Mr. Daramola asserts, in his original and amended Motion, that the government's delay in disclosing the Bank of America information is a *Brady* violation. However, in his Reply, he concedes the evidence is not exculpatory and therefore reidentifies it as a Rule 16 discovery violation. *Id.*; Doc. 242 at 6. Mr. Daramola moves to dismiss on both bases and in the alternate asks the Court to exclude the discovery disclosed on November 14 from evidence. Doc. 228 at 11; Doc. 242 at 7. Mr. Ogunlaja joins in the Motion and its requested relief. Doc. 228 at 11. The government, in Response, argues that the defense has not satisfied *any* element of a proper *Brady* claim on either alleged violation. Doc. 235 at 1.

The Court considers the three necessary *Brady* factors in regard to the government's disclosure of both the FBI 302 report and the recording of the interview with Mr. Ogunlaja. In order to find a *Brady* violation, the Court would need to find that the evidence was suppressed, is

exculpatory, and is material. *Brady*, 373 U.S. at 87. A *Brady* violation requires that a court find all three factors in conjunction. *Walters*, 269 F.3d at 1214. Ultimately, the Court finds that the interview is not material to Mr. Daramola's case and he has not been prejudiced by the delay. Accordingly, the Court need not address whether the evidence is exculpatory or whether it was suppressed. *See id.*; *Reese*, 745 F.3d at 1083.

This *Brady* Motion comes to the Court in unusual posture. Oftentimes *Brady* violations are raised on appeal when the defendant did not have access to exculpatory information at trial. *See e.g. Douglas*, 560 F.3d at 1165; *Case*, 731 F.3d at 1019; *Cone*, 556 U.S. at 475. Defendants in such a posture assert that the existence of the previously undisclosed exculpatory evidence discredits the trial result because "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone*, 556 U.S. at 470; *see also Kyles*, 514 U.S. at 435. Here, there can be no such claim. Mr. Daramola received the interview approximately a month before trial and will have the benefit of using the alleged exculpatory evidence at trial. While late disclosure can create prejudice by negatively affecting a defendant's trial plan, the case law requires that late disclosure be "too late for the defendant[] to make use of any benefits of the evidence" at trial. *Warhop*, 732 F.2d at 777. Even when exculpatory evidence is revealed *during trial*, courts sometimes find that the defense had the opportunity to use the evidence. *See e.g. Burke*, 571 F.3d at 1055 (finding no prejudice when *Brady* evidence is revealed at trial). Mr. Daramola received the recording of the interview on November 15, 2024, more than a month before trial. Doc. 235. Mr. Daramola will have the opportunity to use the evidence at trial and has had enough time to make use of that opportunity. Doc. 240. Therefore, the late disclosure is not prejudicial to Mr. Daramola and there is no *Brady* violation.

It is also not clear that not having access to the evidence would truly prejudice Mr. Daramola. Non-disclosure is prejudicial if "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone*, 556 U.S. at 470. Mr. Daramola alleges that Mr. Olawuyi's statements, that he does not know the owner of Daramola Cars and Daramola Cars had nothing to do with his case, that sometimes money was sent to someone's account without them knowing the fraudulent source of the money, and that he did not know several of the people receiving money from the victim in this case, are exculpatory. However, these statements do not contradict the government's theory of the case. Doc. 235 at 2. The government asserts that it is not uncommon in this kind of international fraud scheme for the person in Mr. Olawuyi's position not to know the name of middlemen, like Mr. Daramola. *Id.* at 3-4. Similarly, the government's own expert made clear that some people who receive money deposits do not know the fraudulent source of the money. November 21, 2024 Hearing Transcript ("H'rg Tr.") at 25:6-23.[4] It is not the government's theory that everyone who receives money from a romance scheme victim is part of a conspiracy to commit wire fraud, but rather that Mr. Daramola in this case did know that the money was from a fraudulent source and was part of a conspiracy. *Id.* at 1-6.

Mr. Daramola specifically raises the issue of prejudice as to his sentencing. Doc. 228 at 9. At the time of his sentencing on September 12, 2024, Mr. Daramola did not know that an interview with Mr. Olawuyi had taken place. *Id.* Mr. Daramola only learned about the interview from his co-defendant after his plea was rejected by the Court. *Id.* at 2-3. While the information may have been relevant to sentencing, the Court did not reach sentencing because the Court rejected Mr.

---

[4] The Court's citations to the transcript refer to the court reporter's original, unedited version; any final transcripts may contain slightly different page and/or line numbers.

Daramola's plea. Doc. 184. This evidence would not have changed the outcome of the hearing because the Court rejected Mr. Daramola's plea based on concerns regarding Mr. Daramola's financial nondisclosure and noncooperation with pretrial services. September 12, 2024 Sentencing Hearing Transcript ("Sent. H'rg Tr.") at 6:25-7:20; 8:7-25. Therefore, the late disclosure of the evidence after the sentencing hearing was not and is not prejudicial to Mr. Daramola, and as such is not material. *Douglas*, 560 F.3d at 1173.

While the Court does not reach the issue of suppression, the Court will note that the FBI knew about the interview and the existence of the recording since August 7, 2024, having themselves conducted the interview. Doc. 228-1 at 1. At the pretrial conference, Agent van Brandwijk, who is based in the United States and works closely with government counsel in this case, specifically mentioned getting an email regarding the interview at the time it took place. H'rg Tr. at 114:3-10. The government should have immediately informed counsel for both Mr. Ogunlaja and Mr. Daramola that such an interview regarding the case and both defendants had taken place, and certainly they should have done so prior to Mr. Daramola's sentencing.

As to Mr. Ogunlaja's joinder, the above analysis finding that the late disclosure is not so late as to block the defense from using the evidence applies to him as well. In addition, as the government correctly states, there is no serious argument that the evidence is in any way exculpatory for Mr. Ogunlaja. Doc. 235 at 4.

Turning to Mr. Daramola's second concern, the Bank of America documents disclosed on November 14, 2024, the Court finds that the government's delay in disclosing these documents does not constitute a *Brady* violation. All parties agree the evidence is not exculpatory. Doc. 242 at 6. In the clear absence of one of the requisite *Brady* factors, the Court must deny the Motion. *Walters*, 269 F.3d at 1214.

In his Reply, Mr. Daramola argues that the late disclosure of the documents is a violation of the government's duty to disclose discovery. *Id.*; Fed. R. Crim. Proc. 16. Mr. Ogunlaja similarly objected to this evidence being admitted at trial because of the late disclosure and on hearsay grounds. Docs. 224, 226. The Court issued a Memorandum Opinion and Order regarding Mr. Ogunlaja's objection to the evidence and finds it is largely applicable to Mr. Daramola as well. Doc. 246. While the Court will not recite the entire analysis here, the Court analyzed the allegation under the *Wicker* factors and found the delayed disclosure did not warrant remedy. *United States v. Wicker*, 848 F.2d 1059, 1061 (10th Cir. 1988) (describing the three factors to consider in alleged discovery violation as 1) the government's reasons, including good or bad faith, 2) the extent of the prejudice to the defendant, and 3) the feasibility of a continuance curing the prejudice). In overruling Mr. Ogunlaja's objection, the Court found that the government did not act in bad faith, but it was negligent in failing to review the relevant documents for almost two months. *See United States v. Yepa*, 608 F. App'x. 672, 678-79 (10th Cir. 2015) (finding government was negligent when counsel failed to review evidence sent from the FBI for a week after they received it). Even though Mr. Daramola had entered into a plea agreement, the bank records, just like the statements from Mr. Olawuyi's interview, could have been relevant to both his sentencing and his decision to maintain his plea of guilty. For instance, learning that the government might present this evidence at trial may have weighed in favor of Mr. Daramola maintaining his guilty plea. Thus, the delay is not excused by Mr. Daramola's decision to withdraw his plea occurring on November 4, 2024.

Nevertheless, neither Mr. Ogunlaja nor Mr. Daramola allege specific prejudice as a result of the delayed disclosure. The exhibit in question consists of only two pages of bank records and there is nothing on the record before this Court that indicates this exhibit would have a significant impact on either defendant's trial strategy. *Compare Yepa,* 608 F. App'x at 679 (upholding district

court's exclusion of late evidence after finding that late disclosure of a 911 call could have impacted defendant's trial strategy). Additionally, the evidence was disclosed approximately a month before trial, which while unideal, still gave the defendants and counsel time to review the documents.

Finally, the Court examines the possible sanctions and specifically the ability to cure the late disclosure with a continuance. *Id.* Mr. Daramola states that "further continuances to process the discovery more comfortably pose a hardship on Mr. Daramola." Doc. 228 at 11. The Court also finds that a continuance is not a suitable remedy because it appears unnecessary, considering that the defense will have possessed the information for a full month before trial and has not presented any way in which more time would help them use the relatively new evidence to prepare for trial. *Id.*; Doc. 224 at 6. Although exclusion may be an appropriate remedy where a continuance is not needed or is not possible, the above analysis of the *Wicker* factors that counsels against a continuance similarly counsel against exclusion of the evidence.

While the Court does not find that the late disclosure merits a remedy, the Court is reserving ruling on the admissibility of Exhibit 38, pending the government's ability to provide the necessary authentication. The government argues that the Bank of America counter deposit forms fall under the business records exception in Federal Rule of Evidence 803(6). Doc. 234 at 11. Relevant here, Rule 803(6)(D) requires that records of a regularly conducted activity be authenticated by a qualified witness or by a certification that complies with Rule 902(11) or (12). Fed. R. Evid. 803(6)(D). At this point, the government has not laid a proper foundation for authentication of the documents.

## CONCLUSION

The Court finds that there was no *Brady* violation because the late disclosure of evidence did not prejudice the defendants and therefore is not material. The Court finds that delayed

disclosure of the Bank of America documents does not warrant dismissal or exclusion, but reserves ruling on the admissibility of the documents on hearsay grounds. Accordingly, the Motion must be denied.

**IT IS THEREFORE ORDERED** that Mr. Daramola's Motion to Dismiss for Violations of *Brady v. Maryland* [Doc. 228] is denied consistent with this Memorandum Opinion and Order.

ENTERED this 14th day of December 2024.

_____
MARTHA VÁZQUEZ
SENIOR UNITED STATES DISTRICT JUDGE